UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ALL CONTENT AND OTHER INFORMATION ASSOCIATED WITH THE YAHOO! ACCOUNT BRANDOCOMMANDO619@YAHOO.COM, MAINTAINED AT PREMISES CONTROLLED BY OATH HOLDINGS, INC.; (ii) ALL CONTENT AND OTHER INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT JOJOJOMOJOSO@MY.COM THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC; (iii) ALL CONTENT AND OTHER INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT JOANNA.DEALBA THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC.; AND (iv) ALL CONTENT AND OTHER INFORMATION ASSOCIATED WITH YOUTUBE ACCOUNT JOJO MOJO LE DOPE, MAINTAINTED AT PREMISES CONTROLLED BY GOOGLE, INC. | **APPLICATION FOR A SEARCH WARRANT FOR INFORMATION IN POSSESSION OF PROVIDERS (YAHOO! ACCOUNT, FACEBOOK ACCOUNT, AND YOUTUBE ACCOUNT)**<br><br>No. 20-M-149 |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Patrick W. O'Kain, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to seize the items and information described in Attachments A1, A2, and A3 to the warrant.

2.      I also make this Affidavit in support of applications for search warrants pursuant to 18 U.S.C. § 2703 for all content and other information associated with the following accounts (collectively,      the      "Subject      Accounts"):      (i)      the      Yahoo!      Account

"brandocommando619@yahoo.com ("Yahoo! Account"), maintained and controlled by Oath Holdings, Inc., headquartered at 701 First Avenue, Sunnyvale, California 94089; (ii) the Facebook Account associated with the email address jojojomojoso@my.com ("Facebook Account 1"), maintained and controlled by Facebook Inc. headquartered at 1601 Willow Road, Menlo Park, California 94025; (iii)  the Facebook Account associated with the username "joanna.dealba" ("Facebook Account 2"), maintained and controlled by Facebook Inc. headquartered at 1601 Willow Road, Menlo Park, California 94025; and (iv) the YouTube Account associated with user name "jojo mojo le dope" ("YouTube Account"), maintained and controlled by Google, Inc. headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.  (Oath Holdings, Inc., Facebook, Inc., and Google, Inc. are hereinafter collectively referenced as the "Providers"), The information to be searched in the Yahoo! Account is described in the following paragraphs and in Attachment B1 to the proposed warrant.  The information to be searched in Facebook Account 1 and Facebook Account 2 is described in the following paragraphs and in Attachment B2 to the proposed warrant.  The information to be searched in the YouTube Account is described in the following paragraphs and in Attachment B3 to the proposed warrant

     3.      I am a Special Agent with the Drug Enforcement Administration ("DEA").  I have been a DEA Special Agent for approximately 7 years and am currently assigned to the New York Division.  During my tenure with the DEA, I have participated in numerous investigations of money laundering and drug trafficking organizations during which I have conducted physical and electronic surveillance, executed court-authorized search warrants, debriefed cooperating witnesses and victims, reviewed and analyzed numerous taped conversations of those engaged in illegal activity, monitored wiretapped conversations and reviewed line sheets prepared by wiretap monitors.  Through my training, education and experience, I have become familiar with the manner

in which money laundering and drug trafficking schemes are carried out and the efforts of persons involved in each activity to avoid detection by law enforcement.  Through my training and experience, I also have become familiar with some of the ways in which such individuals use electronic devices and social media in furtherance of their crimes, and have participated in the execution of search warrants involving electronic evidence.

4.      This Affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information.  This Affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

JURISDICTION TO ISSUE WARRANT FOR THE SUBJECT ACCOUNTS

5.       Pursuant to 18 U.S.C. § 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Providers, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6.      A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

7.      When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. Id.

§ 2703(a), (b)(1)(A), (c)(2) & (3).  Additionally, the Government may obtain an order precluding the Providers from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation.  Id. § 2705(b).  As indicated further below, the government makes such an application in this case.

THE SUBJECT OFFENSES

8.      For the reasons detailed below, I submit that there is probable cause to believe that the Subject Accounts contain evidence, fruits, and/or instrumentalities of violations of 21 U.S.C. § 841 (possession with intent to distribute controlled substances), 18 U.S.C. §1956 (money laundering), as well as attempting, aiding and abetting and conspiring to commit those crimes, see 21 U.S.C. § 841 and 18 U.S.C. 1956(h) (the "Subject Offenses").

BACKGROUND

Dark Web Marketplaces and Wall Street Market

9.      Through the dark web or darknet, individuals have established online marketplaces, such as Silk Road, AlphaBay, DreamMarket, Wall Street Market, Point/Tochka, and Berlusconi, for narcotics and other illegal items.  These marketplaces operate on "The Onion Router" or "TOR" network.  The TOR network is a special network of computers on the internet that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users.  TOR likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the TOR network.  Such "hidden services" have complex web addresses, which are many times generated by a computer algorithm, ending in ".onion" and can only be access through specific web browser software designed to access the TOR network.

10.        From approximately 2016 to 2019, Wall Street Market was a darknet marketplace where vendors advertised and marketed the sale of illegal narcotics, malicious software, stolen financial data, counterfeit goods, and more.  Wall Street Market operated like a conventional e-commerce website, such as eBay and Amazon.  However, its sole existence was geared to the trafficking of contraband.  Wall Street Market was a "hidden service," that is, a site on the darknet accessible only by programs such as TOR.  Its interface was available in six different languages: English, German, Spanish, French, Portuguese, and Italian.  As of April 22, 2019, Wall Street Market was one of the largest and most voluminous darknet marketplaces of all time, made up of approximately 5,400 vendors and 1,150,000 customers around the world, as advertised and posted on the Wall Street Market homepage.  In May 2019, Wall Street Market was shut down by U.S. and foreign law enforcement authorities in conjunction with the arrest of its administrators.

11.        Wall Street Market required its users to register for a free account by selecting a unique username (otherwise known as a moniker) and password.  Once an account was created, users were able to browse goods for sale from the home page, which were organized by specific categories.  Some of the categories included "Drugs," "Counterfeits," "Jewelry & Gold," "Carding Ware," "Services," "Software & Malware," "Security & Hosting," "Fraud," "Digital Goods," and "Guides & Tutorials."  Wall Street Market also provided a search function that allowed users to conveniently locate listings for the types of illegal goods or services they would want to purchase, and permitted searching by price range, popularity of item, vendor ratings, origin or shipping country, and payment type.  Wall Street Market buyers were able to make purchases of contraband and illegal services on the marketplace and usually received the physical contraband through the United States Mail and/or other means of physical delivery, such as commercial couriers and encrypted file-share programs.

12.  Wall Street Market sellers (also known as vendors) were required to pay for their vendor account and were provided a vendor webpage profile on Wall Street Market, akin to a storefront, where a vendor could advertise contraband.  Vendors were given access to edit their webpage after logging in to Wall Street Market.  A vendor webpage included vendor statistics, listings of their contraband, and the ability to track the vendor's statistics and income generated over the course of the account's existence.  Wall Street Market assisted buyers and vendors with instructions as to how to purchase such contraband and/or how it would be dispatched by the vendor.

13.  Vendors received ratings from buyers based on, among other things, the quality of contraband, reliability of delivery, and volume of traffic.  In addition, Wall Street Market assessed rankings for vendors based on user input.

14.  Wall Street Market offered a platform for users to communicate with vendors with the option to encrypt their communications, such that only those parties involved could read the messaging between them.  Wall Street Market also operated a forum allowing users to discuss matter related to the marketplace.  The forum was maintained and operated by a moderator, whose responsibilities included responding to questions posed by users.

15.  Like other dark web marketplaces, Wall Street Market required its users to trade in digital currencies, primarily Bitcoin, and the marketplace did not allow for transactions in official, government-backed fiat currency.  For each sale of contraband on the marketplace, Wall Street Market obtained a commission, ranging from approximately 2-5% of each transaction fee, dependent upon the vendor's status and/or rating.

Digital Currency and Bitcoin

16.  Digital currency (also known as crypto-currency) is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e. currency

created and regulated by a government).  Digital currency exists entirely on the internet and is not

stored in any physical form.  Digital currency is not issued by any government, bank, or company

and is instead generated and controlled through computer software operating on a decentralized

peer-to-peer network.  Digital currency is not illegal in the United States and may be used for

legitimate financial transactions.

17.	However, digital currency is often used for conducting illegal transactions,

such as the sale of controlled substances.  Because digital currencies can be exchanged and

transferred peer-to-peer, users who use digital currencies can limit their interaction with

traditional, regulated financial institutions, which are required to collect information about their

customers and maintain anti-money laundering and fraud detection measures.  Users of digital

currencies are therefore able to bypass the traditional financial systems, and marketplaces like Wall

Street Market completely bypass those systems by only permitting digital currencies as a means

of payment.

18.	Bitcoin is a type of digital currency.  Bitcoin payments are recorded in a

public ledger called a blockchain that is maintained by peer-to-peer verification and is thus not

maintained by a single administrator or entity.  Individuals can acquire Bitcoins either by "mining"

or by purchasing Bitcoins from other individuals.  An individual can "mine" for Bitcoins by

allowing his/her computing power to verify and record the Bitcoin payments on the blockchain.

Individuals are rewarded for this by being given newly created Bitcoins.

19.	An individual can send and receive Bitcoins through peer-to-peer digital

transactions or by using a third-party broker.  Such transactions can be done on any type of

computer, including laptop computers, tablets, and cellular telephones.

20.        Bitcoins can be stored in "wallets".  A digital wallet essentially stores the access code that allows an individual to conduct Bitcoin transactions on the public ledger.  To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key").  The public address can be analogized to an account number while the private key is like the password to access that account.

21.        Even though the public addresses of those engaging in Bitcoin transactions are recorded on the blockchain, the true identities of the individuals or entities behind the public addresses are not recorded.  If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity.

<u>PROBABLE CAUSE</u>

<u>Identification of RAPTURERELOADED on Wall Street Market</u>

22.        In 2018, DEA agents identified a narcotics vendor on Wall Street Market with the online moniker "RAPTURERELOADED."  According to information obtained from RAPTURERELOADED's profile on Wall Street Market, RAPTURERELOADED had been a United States-based seller of heroin and methamphetamine since June 2018. RAPTURERELOADED's advertisement stated:

> Reporting from Baja, CA, AZ, and NY!  Have you ever paid attention to where your product is coming from other than the purpose of shipping time?  Allow us to put things into perspective for a sec.  Colombian cocaine, California's chronic, and Cuba's cigars wouldn't be notorious if not for their quality.  We stand behind our products so much that we decided to centralize near the sources last year.

23.        RAPTURERELOADED's listings page also claimed that it tracked all orders and offered a variety of "stealth" delivery options, including options designed to thwart "controlled deliveries."  For example:

We also track every order for yours (and ours) piece [sic] of mind! For those of you that use informed delivery, this service that we pay for uses the same system to scan your package. This barcode provides us with tracking information as your packages are scanned at each postal facility. We check on your orders every day and if we catch something ahead of time we will contact you. What does this mean for you? Free 1st class shipping with real tracking free of charge!!!

24. During the course of the investigation, the DEA conducted several reviews of RAPTURELOADED's activity on the Wall Street Market, with the most recent review conducted on January 8, 2019. The DEA also learned that Wall Street Market maintains a "Vendor Level," which reflects the vendor's successful transactions, positive reviews, and the recruitment of new users. Vendor Levels, in turn, are based on the amount of experience points accrued.

25. Based on the analysis conducted, as of on or about October 3, 2018, RAPTURERELOADED had completed 167 transactions on Wall Street Market and held a Vendor Level of 9 with 113,000 experience points. As of on or about January 8, 2019, RAPTURERELOADED had completed 380 transactions on Wall Street Market and held a Vendor Level of 11 with 346,000 experience points. This means that in the approximately 3-month period between October and January 2018, RAPTURERELOADED completed approximately 213 orders, raised his/her Vendor Level by 2, and gained approximately 179,000 experience points. Screenshots of RAPTURERELOADED's advertisements and profile page show that she advertised and sold a variety of narcotics including: fentanyl, heroin, oxycodone, methadone, cocaine, methamphetamine, ecstasy, and Green Rolex (a substance containing MDMA (3,4-methylenedioxy-methamphetamine)).

<u>Undercover Narcotics Purchases from RAPTURERELOADED</u>

i. <u>October 3, 2018</u>

26.     On or about October 3, 2018, a DEA Special Agent acting in an undercover capacity ("UC"), went to RAPTURERELOADED's listings on Wall Street Market and purchased 10 grams of heroin for a total of $510 ($500 for the heroin and $10 for shipping).   Per RAPTURERELOADED's instructions on his/her listings, the UC provided a shipment address in Queens, New York for the heroin.   Upon entering the order for 7 grams of heroin, the UC was given an identification number for the transaction and a trade address where Bitcoin should be sent as payment.   The UC was also told a price in Bitcoin based on the exchange rate at the time of the purchase.   The UC then sent the Bitcoin to RAPTURERELOADED via the escrow function on Wall Street Market, as requested.

27.     On or about October 4, 2018, RAPTURERELOADED marked the heroin as shipped.   On or about October 11, 2018, the UC sent a message to RAPTURERELOADED via Wall Street Market stating, "Hey Rapture I have not received anything yet. Was it sent out?  Do you have a tracking #?"   On or about October 12, 2018, RAPTURERELOADED responded, stating "Your order is out for delivery 10/12/18.  If you wish to reorder with us please allow up to 10 business days for delivery.  Thank you.  –RR".  RAPTURERELOADED also sent the UC a tracking number for the package from a third-party private parcel tracking service (hereinafter referred to as "LetterTrack").

28.     On or about October 18, 2018, the UC retrieved the package that RAPTURERELOADED sent to the UC's mailbox in Queens, New York.   The package had a return address of "R&R Inc., 1201 Vine Street, Los Angeles, CA 90036".  The package also bore

a postmark from San Diego, California dated October 9, 2018.  A search of the package revealed a bag that contained approximately 10 grams of a substance that tested positive for heroin.

ii.  January 3, 2019

29.        On or about January 3, 2019, the UC went to RAPTURERELOADED's listings on Wall Street Market and purchased 30 grams of heroin for a total of $1,810 ($1,800 for the heroin and $10 for shipping).  Per RAPTURERELOADED's instructions on his/her listings, the UC provided a shipment address in Queens, New York for the heroin.  Upon entering the order for 30 grams of heroin, the UC was given an identification number for the transaction and a trade address where Bitcoin should be sent as payment.  The UC was also told a price in Bitcoin based on the exchange rate at the time of the purchase.   The UC then sent Bitcoin to RAPTURERELOADED via the escrow function on Wall Street Market, as requested.

30.        Later in the day on or about January 3, 2019, the UC went to RAPTURERELOADED's listings on Wall Street Market and purchased 10 grams of methamphetamine for a total of $160 ($150 for the methamphetamine and $10 for shipping).  Per RAPTURERELOADED's instructions on his/her listings, the UC provided a shipment address in Queens, New York for the heroin.  Upon entering the order for 10 grams of methamphetamine, the UC was given an identification number for the transaction and a trade address where Bitcoin should be sent as payment.  The UC was also told a price in Bitcoin based on the exchange rate at the time of the purchase.  The UC then sent Bitcoin to RAPTURERELOADED via the escrow function on Wall Street Market, as requested.

31.        On or about January 14, 2019, the UC retrieved the package that RAPTURERELOADED sent to the UC's mailbox in Queens, New York.  The package had a return address of "Wallsteen Market Inc." at 1600 North Arizona Avenue, San Hacienda Chandler,

AZ 85225.  The package also bore a postmark with a tracking number.  According to the tracking number transit history, the parcel originated at a United States Postal Service facility in San Diego, California on or about January 9, 2019.  A search of the package revealed a small plastic container that contained approximately 30 grams of a substance that tested positive for heroin.  The package also contained a clear plastic bag that contained approximately 10 grams of a substance that tested positive for methamphetamine.

iii.   <u>January 22, 2019</u>

32.        On or about January 22, 2019, the UC went to RAPTURERELOADED's listings on Wall Street Market and purchased 20 grams of heroin for a total of $310 ($300 for the heroin and $10 for shipping).  Per RAPTURERELOADED's instructions on his/her listings, the UC provided a shipment address in Queens, New York for the heroin.  Upon entering the order for 20 grams of heroin, the UC was given an identification number for the transaction and a trade address where Bitcoin should be sent as payment.  The UC was also told a price in Bitcoin based on the exchange rate at the time of the purchase.  The UC then sent Bitcoin to RAPTURERELOADED via the escrow function on Wall Street Market, as requested.  The heroin was not received by the UC, likely because the individual posing as RAPTURERELOADED was detained at the San Ysidro Port of Entry on or about January 31, 2019 and questioned about several parcels containing drugs.[1]  On or about February 6, 2018, DEA agents, acting in an undercover

---

[1]    On or about January 31, 2019, DE ALBA entered the United States from Mexico through the San Ysidro, California Port of Entry.  Prior to entering, Customs and Border Patrol officers referred DE ALBA to secondary inspection.  During the secondary inspection, officers questioned DE ALBA about packages containing narcotics that had been sent to her home address.  The officers also questioned DE ALBA about potential fentanyl precursor chemicals found in her vehicle.  DEALBA denied any connections to narcotics trafficking and the officers permitted her to enter the United States.

12

capacity sent an email to RAPTURERELOADED at raptureroom@protonmail.com and inquired about the shipment.  RAPTURERELOADED responded that the organization ran into technical difficulties, provided a new email address, and informed the agents that they were discontinuing use of the raptureroom@protonmail.com account.

Identification of RAPTURERELOADED as JOANNA DE ALBA

33.     RAPTURERELOADED provided the UC with a tracking number from LetterTrack for the heroin that the UC purchased on or about October 3, 2018.  According to LetterTrack's website, LetterTrack is a paid service that allows users to track items shipped via regular first-class United States mail.  LetterTrack sells United States Postal Service-intelligent barcodes that a shipper can add to a piece of regular first-class U.S. mail that allows the mail piece to be tracked as it travels through the postal system to its destination.

34.     DEA obtained records from LetterTrack's tracking system, and learned that the package containing the heroin that was purchased on October 3, 2018, was shipped by LetterTrack User ID 1732 (the "1732 Account"), which is registered to R&R, Inc., 114 C Avenue, Coronado, California 92118 (the "Coronado Address").  According to open source and public record research, this address appears to be an apartment building with several retail storefronts. The phone number associated with R&R was 619-934-9016 (the "9016 Number").  The sender of the package purchased 250 shipment tracking barcodes from LetterTrack on or about July 27, 2018 using a credit card in the name of DE ALBA.  Subpoena results for the 9016 Number indicate that the subscriber is "Revolve Laundry" with a billing address of 2675 Customhouse Court, Suite K, San Diego, CA 92154.[2]  However, a review of public record databases revealed that the 9016

_____

[2]     Revolve Laundry appears to be a commercial laundry business. The connection between DE ALBA and Revolve Laundry is under investigation.

Number associated with the package is associated with DE ALBA at 1332 La Tempra Corte, Chula

Vista, California.  A review of California motor vehicle records revealed that DE ALBA resides

at 1332 La Tempra Corte, Chula Vista, California.

35.  A further review of LetterTrack records revealed four other accounts—in

addition to the 1732 Account used for the October heroin shipment—that are associated with DE

ALBA:

| User ID | Name | Company Name | Address | Phone Number | Email |
|---------|------|--------------|---------|--------------|-------|
| 1732 | R&R, Inc. | WSM | Coronado Address | 9016 Number | **Yahoo! Account** |
| 1719 | R&R, Inc. | | Coronado Address | 619-576-2337 | jojojomojoso@my.com |
| 1718 | R&R, Inc. | R&R, Inc. | Coronado Address | 9016 Number | lyftyourlyfe@my.com |
| 1713 | B. Unangst | R&R, Inc. | Coronado Address | 619-344-9553 | rapturereloaded@protonmail.com |
| 1705 | Brandon Unangst | Rapture | Coronado Address | 619-576-2337 | raptureroom@protonmail.com |

36.  According to LetterTrack, all five of the accounts were created in or about July

2018, which is shortly after the RAPTURERELOADED account was created on Wall Street

Market.  As discussed above, the 1732 account that was used for the October heroin shipment was

funded with a credit card in the name of DE ALBA.  The 1705 account was funded using a credit

card bearing the same number, expiration date, and card verification value ("CVV").  However,

the card was in the name of Brandon Unangst ("Unangst").

37.     A review of public records and open source social media accounts revealed that Unangst was married to DE ALBA from in or about April 2017 until Unangst's reported death on or about March 6, 2018.[3]

38.     Since Unangst's reported death, DE ALBA had been utilizing his identity and credit cards – in addition to her own – to fund her narcotics business on Wall Street Market. For example, as explained above, DE ALBA used her credit card and Unangst's credit card to create and fund the LetterTrack accounts in July 2018 – approximately four months after Unangst's reported death.  Moreover, each account bears a connection to DE ALBA and/or Unangst:

39.     **Account 1732 bears DE ALBA's cellular telephone number and an email in the name of brandocommando619@yahoo.com (i.e. the Yahoo! Account)**, which based on my training and experience is likely an email associated with Brandon Unangst.

40.     Account 1719 bears an email in the name of jojojomojoso@my.com.  **A review of Facebook Account 1 lists "jojomojosodope" as a nickname for DE ALBA.  A user named "jojo mojo le dope" maintains a YouTube account (i.e. the YouTube Account) that contains a profile picture that is similar to the logo used by RAPTURERELOADED on Wall Street Market.**  Specifically, both accounts use a reversed capital R beside a normal capital R, visually similar to ЯR, inside a five-pointed star.  The YouTube account contains a video titled, "Newlyweds getting goofy!" and shows an unidentified male and female.  Agents have reviewed the images of the male in the video and compared them to Unangst's California driver license photo and believe they are the same person.

---

[3]     On or about March 16, 2018, DE ALBA posted on a Facebook page associated with Unangst about his death.  Specifically, DE ALBA posted, "This is Joanna Unangst, Brandon Unangst's Y-Fee….[Unangst] passed last Tuesday peacefully in our home."  In the post, DE ALBA also refers to herself as Unangst's "Y-fee," which, based on my training and experience, is slang for "wifey" or wife.

41.        Account 1718 bears DE ALBA's cellular telephone number, and an email in the name of lyftyourlyfe@my.com.  **A review of Facebook Account 2 revealed that DE ALBA lists her occupation to be "independent contractor" for the ride-sharing company Lyft.**  Account 1713 bears Unangst's name and an email in the name of rapturereloaded@protonmail.com.  Account 1705 bears Unangst's name and an email in the name of raptureroom@protonmail.com.

Seizures Related to DE ALBA's Dead Husband's Address

42.        On or about August 12, 2018, United States Customs and Border Protection ("CBP") intercepted a package from the Netherlands that was addressed to Unangst at the Coronado Address.  The package contained approximately 30 grams of a brownish crystal-like powder that field tested positive for methamphetamine.  Unangst had been reportedly dead for approximately five months at the time the package was intercepted.

43.        On or about September 30, 2018, CBP intercepted a package from the Netherlands that was addressed to Unangst at 482 W San Ysidro Blvd, Apartment 1571, San Ysidro, California (the "San Ysidro Address").[4]  The package contained approximately 52 tablets that tested positive for methamphetamine.  Unangst had been reportedly dead for approximately seven months at the time the package was intercepted

44.        On or about November 6, 2018, CBP intercepted a package from the Netherlands that was addressed to Unangst at the San Ysidro Address.  The package contained approximately 207 pills that tested positive for methamphetamine.  Unangst had been reportedly

---

[4]        482 W San Ysidro Blvd, Apartment 1571, San Ysidro, California is the address for a company that provides mailbox rental services.  DE ALBA admitted to law enforcement during the border stop described above that she maintained P.O. Box 1571 at this location.

dead for approximately eight months at the time the package was intercepted.  As set forth below, DE ALBA continued to receive packages that were addressed to Unangst after his death.

45.     On or about January 3, 2019, the Department of Homeland Security, Homeland Security Investigations ("HSI") intercepted a package from Canada that was addressed to Unangst at the San Ysidro Address.  The package contained approximately 4.2 grams of a substance that tested positive for fentanyl.  Unangst had been reportedly dead for approximately 10 months at the time the package was intercepted.

46.     On or about January 14, 2019, CBP intercepted a package from the Netherlands that was addressed to Unangst at the San Ysidro Address.  The package contained approximately 239.23 grams of a substance (in tablet form) that tested positive for methamphetamine.  Unangst had been reportedly dead for approximately 10 months at the time the package was intercepted.

DE ALBA's Arrest

47.     On or about July 19, 2019, DE ALBA was charged by criminal complaint in the Eastern District of New York with possession with intent to distribute methamphetamine and heroin, in violation of Title 21, United States Code, Sections 841(a) and 841(b)(1)(B)(viii), and 841(b)(1)(C).  The Honorable Steven M. Gold, United States Magistrate Judge for the Eastern District of New York issued an arrest warrant for DE ALBA.

48.     On or about October 24, 2019, DE ALBA was arrested at the San Ysidro, California Port of Entry as she attempted to enter the United States from Mexico.

49.     On or about November 22-23, 2019, the United States Attorney's Office for the Eastern District of New York issued preservation letters to the Providers for the Subject Accounts,

pursuant to Title 18, United States Code, Section 2703(f).  Pursuant to these letters, the contents

of the Subject Accounts are preserved for 90 days.

50.     On or about November 26, 2019, a grand jury sitting in the Eastern District of New

York returned an indictment charging DE ALBA with: (1) conspiracy to possess with intent to

distribute heroin and methamphetamine, in violation of Title 21, United States Code, Sections 846

and 841(b)(1)(B)(viii); (2) distribution and possession with intent to distribute heroin, in violation

of Title 21, United States Code, Sections 841(a) and 841(b)(1)(C); and (3) distribution and

possession with intent to distribute heroin and methamphetamine, in violation of Title 21, United

States Code, Sections 841(a) and 841(b)(1)(B)(viii).  DE ALBA has plead not guilty to all charges.

General Knowledge Regarding Narcotics Trafficking

51.     Based on my training, experience, and participation in this and other narcotics

trafficking investigations and upon my consultation with other experienced law enforcement

officers, I know the following information regarding individuals, involved in drug trafficking:

> a.  Narcotics trafficking is a business that involves numerous co-conspirators, from
>     lower-level dealers to higher-level suppliers, as well as associates to process,
>     package and deliver the narcotics and persons to launder the narcotics proceeds.
>     These persons frequently maintain listings of names, aliases, telephone numbers,
>     pager numbers, facsimile numbers, physical addresses, and email addresses,
>     sometimes encoded and sometimes not encoded, for the purpose of contacting their
>     suppliers, customers, transporters, and others involved in their illicit narcotics
>     distribution activities.  These records are typically maintained on their person or in
>     their residences, stash houses, and/or vehicles, so they are readily available in order
>     to efficiently conduct their narcotics trafficking business.  Moreover, such records
>     are often stored electronically in locations like the Subject Accounts;

b.  Narcotics traffickers often use electronic accounts like the Subject Accounts to communicate with their suppliers, customers, transporters, and others involved in their illicit narcotics distribution activities.

c.  Electronic accounts like the Subject Accounts have the capability of taking and storing still photographs as well as recording and storing videos.  Narcotics traffickers often take pictures and/or videos of their product, proceeds, etc.

d.  Narcotics traffickers keep books, receipts, notes, ledgers and other forms of records specifically relating to their narcotics distribution activities in their electronic accounts.  Because narcotics traffickers often "front" narcotics to their customers – that is, sell the drugs on credit – or receive narcotics from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed with respect to their customers and suppliers.  These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations or may be recorded more formally in spreadsheets, and are frequently encoded in order to protect those involved.

e.  When narcotics traffickers amass wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement.  To accomplish this, narcotics traffickers often use different techniques, including the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange narcotics proceeds into money that appears to come from a legitimate source.  Narcotics traffickers also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder

narcotics proceeds.  Narcotics traffickers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit narcotics sales.  In addition, narcotics traffickers often use wire transfers, cashier's checks, and money orders to pay for narcotics or other costs relating to their distribution business.  Narcotics traffickers often keep records relating to these activities in their electronic accounts.

f.  Drug traffickers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States.  They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another.  They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement.  Narcotics traffickers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, tracking records, and the like, in electronic accounts.

g.  Additionally, based upon my training, education, and experience investigating these conspiracies, I have learned that searches of electronic accounts like the Subject Accounts yields evidence:

i.  tending to identify attempts to import or distribute controlled substances;

20

ii. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the importation or distribution of controlled substances;

iii. tending to identify co-conspirators, criminal associates, or others involved in the importation or distribution of controlled substances;

iv. tending to identify travel to or presence at locations involved in the importation or distribution of controlled substances; and/or

v. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

52. For the reasons set forth above, I submit that there is probable cause to believe that the items listed on Attachments B1, B2, and B3, respectively, which are incorporated herein by reference, will be found in the Subject Accounts, and that those items constitute evidence, fruits, and/or instrumentalities of the Subject Offenses.

BACKGROUND CONCERNING SERVICE PROVIDERS AND SUBJECT ACCOUNTS

Yahoo!

53. Based on my training and experience, I have learned that Yahoo! provides a variety of on-line services, including electronic mail ("email") access, to the public.  Yahoo! allows subscribers to obtain email accounts at the domain name yahoo.com, like the Yahoo! Account listed in Attachment A1.  Subscribers obtain an account by registering with Yahoo!  During the registration process, Yahoo! asks subscribers to provide basic personal information.  Therefore, the computers of Yahoo! are likely to contain stored electronic communications (including retrieved and unretrieved email for Yahoo! subscribers) and information concerning subscribers and their use of Yahoo! services, such as account access information, email transaction

information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

54.     A Yahoo! subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Yahoo!  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

55.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

56.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the

account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

57.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

58.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as

described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email).  Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

Facebook

59.     Based on my training, experience, research, and involvement in this investigation and others, I have learned the following about Facebook accounts, such as Facebook Account 1 and Facebook Account 2:

a.      Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

b.      Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords,

physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

        c.      Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

        d.      Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

        e.      Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations

to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

       f.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

       g.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

       h.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

       i.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as

webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

       j.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

       k.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

       l.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

       m.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

       n.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

       o.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including

start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

          p.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access,

use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

q.  Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

YouTube

19.  Based on my training and experience, I have learned that YouTube is a video hosting service that provides a variety of online services, including video uploads and access, to the general public.  The video hosting service allows subscribers to obtain YouTube channels at the domain name youtube.com such as the Website address listed in Attachment A.  Subscribers obtain an account by registering with the video hosting service.  During the registration process, the video hosting service asks subscribers to provide basic personal information and register under a Google account.  Therefore, the computers of the video hosting service are likely to contain stored electronic communications and information concerning subscribers and their use of the video hosting service's services, such as account access information, video uploads, and account application information.

29

20.     In general, a video that is uploaded by a video hosting service's subscriber is stored on the subscriber's "channel" on the video hosting service's servers until the subscriber deletes the video.  If the subscriber does not delete the video, the video can remain on the video hosting service's servers indefinitely.  Videos that are uploaded are open to public viewing unless the subscriber adjusts the privacy settings to make it private, and thus visible only to the subscriber and users the subscriber selects, or by making it "unlisted," allowing only people who have a link to the video to view it.

21.     A video upload typically includes the content of the video, source of the upload, the date and time at which the video was uploaded, the size and length of the upload, and any text descriptions provided by the account user.

22.     An account user of the video hosting service may also provide a user profile, subscribe to channels belonging to other account users, maintain a playlist of "favorite" videos, and keep a history of liked and/or viewed videos on servers maintained and/or owned by the video hosting service.  Account users may also comment on videos posted by other channels on the video hosting service.

23.     The video hosting services requires users to have a Google account in order to create an account or channel with the video hosting service.  If the user does not already have a Google account, the user must create one, thereby providing certain personal identifying information when registering for a Google account.  This information can include the subscriber's email address, full name, physical address, telephone numbers and other identifiers, including alternative email addresses.

24.     Video hosting services, particularly those working directly with email providers, typically retain certain transactional information about the creation and use of each

account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the email provider's website or via email clients such as Microsoft Access), and other log files that reflect usage of the account. In addition, video hosting services and email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

25.     In some cases, video service provider users and email account users will communicate directly with a video service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers like Google typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

2.     In my training and experience, evidence of who was using a video channel may be found in video uploads, log-in information, comments on videos, subscriptions and subscribers

### REVIEW OF INFORMATION OBTAINED PURSUANT TO THE WARRANTS FOR THE SUBJECT ACCOUNTS

3.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records.  Accordingly, the warrants requested herein will be transmitted to the Providers, which shall be directed to produce a digital copy of any responsive records to law

enforcement personnel within 30 days from the date of service.  Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Attachments B1, B2, B3, and B4 to the proposed warrants.

4.      In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all messages and data within the Subject Accounts.  This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure.  Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure.  As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text.  Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

CONCLUSION

5.      Based on the foregoing, I respectfully request that the Court issue the warrants sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

Respectfully submitted,

S/ Patrick O'Kain
PATRICK W. O'KAIN
SPECIAL AGENT
DRUG ENFORCEMENTADMINISTRATION

Subscribed and sworn to before me
on February 13, 2020:

S/ Lois Bloom
HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>All Content and Other Information Associated with the<br>Yahoo! Account brandocommando619@yahoo.com | )<br>)<br>)<br>)   Case No.   20-M-149<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A1

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B1

**YOU ARE COMMANDED** to execute this warrant on or before _____February 27, 2020_____ *(not to exceed 14 days)*

❏ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Duty Magistrate Judge_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____       _____
*Judge's signature*

City and state:      Brooklyn, New York      Hon. Lois Bloom      U.S.M.J.
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    20-M-149 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____          _____

                                                                                        *Executing officer's signature*

                                                                           _____

                                                                                           *Printed name and title*

<u>ATTACHMENT A1</u>

Property to be Searched

This warrant is directed to Oath Holdings, Inc. ("Oath" or the "Provider"), headquartered at 701 First Avenue, Sunnyvale, California 94089, and applies to all content and other information within the Provider's possession, custody, or control for the account associated with the following email address: "brandocommando619@yahoo.com" (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider.  The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Attachment B1.  Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Attachment B1.

ATTACHMENT B1

Particular Things to be Seized

I.    Information to be Produced by the Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of Oath, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Oath, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Oath is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.    All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized devices and computers, and any devices used to access Oath services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers

("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

      c.      The contents of all emails associated with the account from June 2018 to October 24, 2019, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

      d.      The contents of all instant messages associated with the account from June 2018 to October 24, 2019, including stored or preserved copies of instant messages sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

      e.      The contents of all files and other records stored on Oath servers, including all device backups, all Oath and third-party app data, all files and other records related to Yahoo! Mail, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

      f.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers);

      g.      All records and information regarding locations where the account or devices associated with the account were accessed;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Oath and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Oath (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Oath is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

II.     Information to be Seized by the Government

The items to be seized from the Subject Account includes the following evidence, fruits, and/or instrumentalities of violations of (i) 21 U.S.C. § 841 (possession with intent to distribute controlled substances); (ii) 18 U.S.C. § 1956 (money laundering) as well as attempting, aiding and abetting and conspiring to commit those crimes, see 21 U.S.C. § 846, 18 U.S.C. §§ 371, 1956(h), and 2 (collectively the "Subject Offenses"), including the following for the time period from June 2018 up to and including October 24, 2019:

a.     communications, records, or information consisting of, referring to, or reflecting efforts to procure, import, manufacture, possess, or distribute controlled substances;

b.     communications, records, or information consisting of, referring to, or reflecting efforts to launder or conceal money;

c.     communications, records, or information consisting of, referring to, or reflecting efforts to utilize Wall Street Market, LetterTrack, or ProtonMail;

d.     communications, records, or information consisting of, referring to, or reflecting efforts to plan or prepare for the commission of the Subject Offenses;

e.     communications, records, information, or other evidence consisting of, referring to, or reflecting measures, plans, or efforts to conceal from United States authorities activities undertaken by any person to facilitate the commission of the Subject Offenses, or to delete or destroy electronic evidence;

f.     communications, records, or information regarding counter-forensic programs (and associated data) and other security measures designed to eliminate data from electronic devices;

g.     communications, records, or information concerning the hiring, recruitment, payment of others, or payment from others, in connection with the Subject Offenses;

h.      photograph and video evidence of the Subject Offenses, including but not limited to digital photographs and videos taken in furtherance of or in connection with the Subject Offenses, or depicting any person engaged in activity in furtherance of or in connection with the Subject Offenses;

i.      evidence regarding the use of encrypted methods of communication;

j.       geographic location of user, computer, or device, including but not limited to email content and header information indicating that the email was communicated through a particular physical location and metadata from email attachments that reflect geographic location;

k.       address books, contact lists, or indices storing names, addresses, email addresses, telephone numbers, pager numbers, or fax numbers of potential co-conspirators;

l.      items, records, or information relating to the identity or location of, and communications with, any co-conspirators, including photographs of such individuals;

m.      records relating to travel and financial transactions in furtherance of the Subject Offenses, including the use of credit cards;

n.      location of other evidence, including emails reflecting registration of other online accounts potentially containing relevant evidence;

o.      passwords or other information needed to access the user's electronic devices or other online accounts;

p.      evidence establishing the identity of the user(s) of the Subject Account;

q.      evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

r.    Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

s.    Evidence indicating the subscriber's state of mind as it relates to the crime under investigation;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage and any photographic form.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.   Any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts, may conduct the review of this electronic data.   Pursuant to this warrant, the DEA may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>All Content and Other Information Associated with the<br>Facebook Accounts jojojomojoso@my.com and joanna.dealba | )<br>)<br>)   Case No.   20-M-149<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A2

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B2

**YOU ARE COMMANDED** to execute this warrant on or before _____February 27, 2020_____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.        ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Duty Magistrate Judge_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____        _____
*Judge's signature*

City and state:      Brooklyn, New York           Hon. Lois Bloom           U.S.M.J.
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    20-M-149 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____                  _____
                                                              *Executing officer's signature*

                                                    _____
                                                                *Printed name and title*

<u>ATTACHMENT A2</u>

Property to be Searched

This warrant is directed to Facebook Inc. (the "Provider"), headquartered at 1601 Willow Road, Menlo Park, California 94025, and applies to all content and other information within the Provider's possession, custody, or control associated with: (i) the Facebook Account associated with the email address jojojomojoso@my.com; and (ii) the Facebook Account associated with the username "joanna.dealba" (the "Subject Accounts").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Attachment B2.  Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Attachment B2.

ATTACHMENT B2

Particular Things to be Seized

I.     Information to be Produced by Facebook Inc. (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of Provider, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each account listed in Attachment A:

a.     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b.     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from June 2018 to October 24, 2019;

c.     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from June 2018 to October 24, 2019, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

d.     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.      All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

f.      All other records and contents of communications and messages made or received by the user from June 2018 to October 24, 2019 to present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

g.      All "check ins" and other location information;

h.      All IP logs, including all records of the IP addresses that logged into the account;

i.      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

j.      All information about the Facebook pages that the account is or was a "fan" of;

k.      All past and present lists of friends created by the account;

l.      All records of Facebook searches performed by the account from June 2018 to October 24, 2019;

m.      All information about the user's access and use of Facebook Marketplace;

n.      The types of service utilized by the user;

o.      The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

p.      All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

q.      All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

II.     <u>Information to be Seized by the Government</u>

The items to be seized from the Subject Accounts includes the following evidence, fruits, and/or instrumentalities of violations of (i) 21 U.S.C. § 841 (possession with intent to distribute controlled substances); (ii) 18 U.S.C. § 1956 (money laundering) as well as attempting, aiding and abetting and conspiring to commit those crimes, <u>see</u> 21 U.S.C. § 846, 18 U.S.C. §§ 371, 1956(h), and 2 (collectively the "Subject Offenses"), including the following for the time period from June 2018 up to and including October 24, 2019:

a.      communications, records, or information consisting of, referring to, or reflecting efforts to procure, import, manufacture, possess, or distribute controlled substances;

b.      communications, records, or information consisting of, referring to, or reflecting efforts to launder or conceal money;

c.      communications, records, or information consisting of, referring to, or reflecting efforts to utilize Wall Street Market, LetterTrack, or ProtonMail;

d.      communications, records, or information consisting of, referring to, or reflecting efforts to plan or prepare for the commission of the Subject Offenses;

e.       communications, records, information, or other evidence consisting of, referring to, or reflecting measures, plans, or efforts to conceal from United States authorities activities undertaken by any person to facilitate the commission of the Subject Offenses, or to delete or destroy electronic evidence;

3

f.      communications, records, or information regarding counter-forensic programs (and associated data) and other security measures designed to eliminate data from electronic devices;

g.      communications, records, or information concerning the hiring, recruitment, payment of others, or payment from others, in connection with the Subject Offenses;

h.      photograph and video evidence of the Subject Offenses, including but not limited to digital photographs and videos taken in furtherance of or in connection with the Subject Offenses, or depicting any person engaged in activity in furtherance of or in connection with the Subject Offenses;

i.      evidence regarding the use of encrypted methods of communication;

j.      geographic location of user, computer, or device, including but not limited to email content and header information indicating that the email was communicated through a particular physical location and metadata from email attachments that reflect geographic location;

k.      address books, contact lists, or indices storing names, addresses, email addresses, telephone numbers, pager numbers, or fax numbers of potential co-conspirators;

l.      items, records, or information relating to the identity or location of, and communications with, any co-conspirators, including photographs of such individuals;

m.      records relating to travel and financial transactions in furtherance of the Subject Offenses, including the use of credit cards;

n.      location of other evidence, including emails reflecting registration of other online accounts potentially containing relevant evidence;

o.      passwords or other information needed to access the user's electronic devices or other online accounts;

p.      evidence establishing the identity of the user(s) of the Subject Accounts;

q.      evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

r.      Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

s.      Evidence indicating the subscriber's state of mind as it relates to the crime under investigation;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage and any photographic form.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  Any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts, may conduct the review of this electronic data.  Pursuant to this warrant, the DEA may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>All Content and Other Information Associated with<br>the YouTube Account JOJO MOJO LE DOPE | )<br>)<br>)  Case No.    20-M-149<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____New York_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A3

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B3

**YOU ARE COMMANDED** to execute this warrant on or before _____February 27, 2020_____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Duty Magistrate Judge_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____

_____
*Judge's signature*

City and state:      Brooklyn, New York      Hon. Lois Bloom          U.S.M.J.
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    20-M-149 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____          _____
                                                                        *Executing officer's signature*

                                                                    _____
                                                                        *Printed name and title*

## ATTACHMENT A3

Property to be Searched

This warrant is directed to Google, Inc. (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, and applies to all content and other information within the Provider's possession, custody, or control associated with the YouTube account associated with the user name "jojo mojo le dope" (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Attachment B3.  Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Attachment B3.

## ATTACHMENT B3

Particular Things to be Seized

III.   <u>Information to be Produced by Google, Inc. (the "Provider")</u>

To the extent that the information described in Attachment A is within the possession, custody, or control of Provider, including any messages, records, files, logs, or information that have been deleted but are still available to the Provider, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account listed in Attachment A:

a.   The contents of all videos associated with the account, including stored or preserved copies of videos uploaded and shared publicly, videos that do not allow public viewing, the source and destination address associated with each video, the date and time at which each video was uploaded, the size and length of each video, and all metadata associated with each video;

b.   All records or other information regarding the identification of the account, to include the account used to create the channel, the user's full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.   The types of services utilized;

d.   All records or other information stored at any time by an individual using the account, including subscriptions, subscribers, playlists, comments, and upload information; and

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

The Provider is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

IV.    <u>Information to be Seized by the Government</u>

The items to be seized from the Subject Account includes the following evidence, fruits, and/or instrumentalities of violations of (i) 21 U.S.C. § 841 (possession with intent to distribute controlled substances); (ii) 18 U.S.C. § 1956 (money laundering) as well as attempting, aiding and abetting and conspiring to commit those crimes, <u>see</u> 21 U.S.C. § 846, 18 U.S.C. §§ 371, 1956(h), and 2 (collectively the "Subject Offenses"), including the following for the time period from June 2018 up to and including October 24, 2019:

a.      communications, records, or information consisting of, referring to, or reflecting efforts to procure, import, manufacture, possess, or distribute controlled substances;

b.      communications, records, or information consisting of, referring to, or reflecting efforts to launder or conceal money;

c.      communications, records, or information consisting of, referring to, or reflecting efforts to utilize Wall Street Market, LetterTrack, or ProtonMail;

d.      communications, records, or information consisting of, referring to, or reflecting efforts to plan or prepare for the commission of the Subject Offenses;

e.       communications, records, information, or other evidence consisting of, referring to, or reflecting measures, plans, or efforts to conceal from United States authorities activities undertaken by any person to facilitate the commission of the Subject Offenses, or to delete or destroy electronic evidence;

f.      communications, records, or information regarding counter-forensic programs (and associated data) and other security measures designed to eliminate data from electronic devices;

g.      communications, records, or information concerning the hiring, recruitment, payment of others, or payment from others, in connection with the Subject Offenses;

h.      photograph and video evidence of the Subject Offenses, including but not limited to digital photographs and videos taken in furtherance of or in connection with the Subject Offenses, or depicting any person engaged in activity in furtherance of or in connection with the Subject Offenses;

i.      evidence regarding the use of encrypted methods of communication;

j.      geographic location of user, computer, or device, including but not limited to email content and header information indicating that the email was communicated through a particular physical location and metadata from email attachments that reflect geographic location;

k.      address books, contact lists, or indices storing names, addresses, email addresses, telephone numbers, pager numbers, or fax numbers of potential co-conspirators;

l.      items, records, or information relating to the identity or location of, and communications with, any co-conspirators, including photographs of such individuals;

m.      records relating to travel and financial transactions in furtherance of the Subject Offenses, including the use of credit cards;

n.      location of other evidence, including emails reflecting registration of other online accounts potentially containing relevant evidence;

o.      passwords or other information needed to access the user's electronic devices or other online accounts;

p.      evidence establishing the identity of the user(s) of the Subject Account;

q.      evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

r.      Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

s.      Evidence indicating the subscriber's state of mind as it relates to the crime under investigation;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of electronic storage and any photographic form.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  Any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts, may conduct the review of this electronic data.  Pursuant to this warrant, the DEA may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.